Price, J.
The parties agree 'upon some of the facts of this case, and they are not all of a merely historical character. John Greenlee and his wife, Anna, in December, 1900, were old people, residing on sixty acres of land in Hancock county, and this had been their home for many years. Fifty acres of the sixty were valuable oil producing lands owned by the wife and on it was the residence, *297 and most, if not all, the other improvements: The other ten acres belonged to the husband and were in most part timber lands. They had no children, but had nephews and nieces residing in the immediate neighborhood, who are now plaintiffs in error, but the wife had no known blood relatives living within the United States. The husband had a brother, Matthew, then residing in Delaware county, Pennsylvania, and another brother, James, then residing in Gratiot county, Michigan; a brother-in-law, Henry Trotter, then living in Ireland, and a sister, Jane Lewis, then residing in Knoxville, Tennessee. Mary Duffield was a foster daughter, who had resided with the old couple from her youth and was regarded as one of the family during their lifetime and remained with the widow, Anna, after the death of John Greenlee.
In December, 1900, both the husband and wife were in ill health. According to the testimony of some of the witnesses, the husband was suffering from typhoid fever, and other witnesses state that his affliction was some disease of the lungs. It was thought by his physician, the visitors and attendants that he would not long survive. It seems that the wife was afflicted with what was considered typhoid fever, but as to the severity or virulence of the disease, the witnesses greatly differ..
It was found by the circuit court as one of the facts of the case, “that on the 23d day of December, 1900, said John Greenlee seemed, in his then condition, to be desirous of making a will, and for some reason, or under some influence, seemed at that time to have a desire that the defendants, Matthew Willis, Jane Beeson, John Willis and *298 Rachel Duffield, who were the children of a sister of said John Greenlee, and one Mary Duffield, a foster daughter of the said John and Anna Green-lee, should in equal proportions be the recipients of his testamentary bounty.” M. A. Adams was a neighbor and a justice of the peace, and he was invited to the home of the Greenlees to draft the will, and he was then informed of the desire of John that said farm should be ultimately divided between said five individuals. In conversation with the husband and wife about his desire and the nature of the property to be disposed of, it was found by the justice that the farm did not all belong to John, but that fifty acres of it belonged to his wife. The justice perhaps suggested, that to enable the husband to dispose of the entire sixty acres, it was necessary that the wife should convey her land to the husband. Further proceedings were deferred until the next day, with the understanding that such conveyance and will should be prepared by the justice, Adams. He did prepare a conveyance of the wife’s lands to John Greenlee, through George Crawford, another neighbor, who acted as trustee for that purpose, and on the evening of December 23d, Adams, the justice, and Crawford repaired to the home of the old couple, and there a conveyance of the wife’s lands to Crawford was submitted for the wife’s signature, and her name was signed to the same by some one, and the same duly witnessed. The justice then and there certified that the execution of said deed was duly acknowledged before him. At the same time George Crawford executed a deed for the same *299 lands to John Greenlee, which was duly witnessed and acknowledged.
At the same time, and as a part of the same transaction, the justice, Adams, drafted a will by the terms of which he gave his wife a life estate in the sixty acres and the remainder to the said nephews and nieces and Mary Duffield, according to his desire as expressed on the previous day. The will was signed by the husband and duly attested by two witnesses. After these three documents had been thus completed, they were delivered to John, or as stated in the sixth finding of fact — “that thereupon said Adams, justice of the peace, prepared a formal deed of conveyance of said entire fifty acres of land from the said Anna Greenlee to one George Crawford, a neighbor selected for that purpose, and a like conveyance from Crawford to John Greenlee, which two deeds were then formally executed, as was also a will of John Greenlee, and all three of said documents were left by the said justice of the peace in the custody and control of the said John Greenlee and his wife, Anna Greenlee, and the attendants in charge of said John and Anna, both of whom were then seriously ill as aforesaid, with instructions to have said two deeds transferred and recorded, and said will deposited with the probate judge of said county.”
Both husband and wife measurably recovered from their illness and the husband had possession of the deeds and will until he died, which was more than a year after their execution, after which they were in the custody of his widow, Anna, until the appointment of Baker as her guardian on the ground of her imbecility. This appointment was *300 made on or about the — day of-, 1903, and he took possession of the deeds and will and refused to surrender either, but on citation issued by the probate court, he surrendered the will and it was duly probated.
The foregoing facts are taken from the findings of the circuit court and from the undisputed evidence contained in the record. There is no intimation that John Greenlee was lacking in mental capacity at the time the will and deeds were executed, or at any other time. We have a right to assume from the facts and circumstances that he was then of sound mind and disposing memory; and there is no claim or ground for claiming that the wife, Anna, was of weak mind or lacking in mental capacity, except at and about the time of the execution of the deeds and will, and upon that subject the circuit court states its finding of facts as follows:
“Seventh. That the execution of said deed by the said Anna Greenlee was formally accomplished after the following manner, that is to say, she was held up in the bed in which she was confined, in a sitting posture, and the foster daughter, Mary Duffield, under the direction of the justice, took the hand of said Anna Greenlee, in which pen had been placed, and wrote the name of said Anna upon said deed, and the said justice thereupon certified the acknowledgment of the deed as having been executed.
“Eighth. That at the time said Anna Green-lee was over seventy years of age, and in that condition of health that she did not understand what was being done respecting the execution of the deed or its effects upon her or her property *301 rights, and in fact was not conscious of the fact that she was being procured thus formally to execute a conveyance to her property.”
The ninth and tenth findings state in substance that there was in fact no consideration for the conveyance of the wife, and that the same was not intended for the use and benefit of the husband himself, but in order to place the nominal legal title in him to the end that he might dispose of the lands by his will then being executed as part of the same transaction; and that after the instruments had been executed, the wife and husband were dissatisfied therewith and expressed their disapproval of the transaction, but that no reconveyance was ever made and that these documents were kept as mere “relics and mementoes.” We think it plainly appears from these findings and other facts, that the old couple had discussed the subject of testamentary disposition some time before the justice of the peace was called in, and that each had sufficient mind to canvass the objects of their bounty and contemplate some mode of carrying their wishes into an instrument that would accomplish their desires. Whether they were afterwards dissatisfied with the provisions of the deeds and will, is a matter seriously in dispute and the evidence relating to their expressions is in sharp conflict, but no attempt was ever made to undo any part of the important transaction— no attempt at reconveyance or revocation of the will. They had been executed and delivered, and the husband’s will is now of record. It is idle for the court, or any one, to say they repudiated these solemn instruments, for the law does not recognize that method of destroying their effect.
*302 And as to the seventh and eighth findings, it can be said that the evidence of Mary Duffield alone tends to support them, and the manner of the execution of the deed by the wife, as described in the seventh finding, is founded solely upon that evidence. She is financially interested in setting aside the deeds, and thereby render the will inoperative on the fifty acres conveyed by the wife to her husband, as will appear hereafter from the provisions of the wife’s will. She is flatly contradicted as to the mental and physical condition of the wife by the justice of the peace, George Crawford, and at least two other witnesses who were present when the documents were executed. They say that instead of the wife being sick in bed and unconscious, she was up and about the house and took part in the business on hand. The petition of the guardian does not aver that Anna was unconscious when she signed the deed. We are quite confident that the great weight of the evidence is against the theory of the seventh finding. But we grant it, that the circuit court might be justified in believing Mary Duffield and disbelieving the other witnesses, and if the consideration of the case ended here, we would not proceed to weigh the evidence and determine its preponderance. However, there are other facts of such probative force, that they silence all doubt on the present controversy, and demonstrate that the circuit court did not apply the proper rule in considering the evidence.
To justify the court in declaring the deed void, the evidence should be clear and convincing and the.rule of preponderance stands aside, as held in *303 Potter v. Potter, Exrx., 27 Ohio St., 84; Ford v. Osborne, 45 Ohio St., 1.
As before stated the deeds and will were executed December 23, 1900. The sixth finding states that “the two deeds were then formally executed,” and whether the lower court intended to use so strong a phrase or not, it is not disputed that the certificate of the justice to each deed was in due and legal form. What, then, is its legal signification, when the wife through her guardian' attacks the conveyance?
It is said in Baldwin v. Snowden et al., 11 Ohio St., 203, that “a regular statutory certificate of the acknowledgment of a deed of conveyance, made by husband and wife, is, in the absence of fraud, conclusive evidence of the facts therein stated.” In the opinion of the court, by Scott, J., the character and effect of such a certificate are fully discussed. Again, in Ford v. Osborne, 45 Ohio St., 1, the subject was before this court, and it is there held that: “Where it is claimed by the wife that a deed, signed by her husband and herself as a conveyance of her lands, has not been acknowledged by her as it purports to have been, the burden is upon her to show the fact by clear and convincing proof; a mere preponderance of the evidence is not sufficient to support a finding contrary to the certificate of acknowledgment.”
Looking to the evidence, as we have a right to do, in order to ascertain whether the circuit court applied the proper standard, we have no difficulty in deciding that it did not. This view is confirmed and strengthened when we consider and compare provisions of the husband’s will with those found in the will of the wife executed over *304 ten years later. He devised to his wife a life estate in the sixty-acre farm, and the stock, household goods, provisions and other goods and chattels absolutely, with the interest on all sums due him, and that on the death of the wife, his executor should sell the land to the best advantage and divide the proceeds and remaining personal property in paying certain specific legacies, and in the sixth item gives and bequeaths to Mary Duffield, “who has been as good and kind to us as a daughter, and to my nephews and nieces, John Willis, Rachel Duffield, Jane Beeson and Matthew Willis, each one-fifth of the remainder of my estate.” Matthew Willis was made executor with power to sell the real estate.
We now turn to the will of Anna Greenlee, executed on the 24th day of January, 1901. By the second item she gives to Mary Duffield, the foster daughter, all the personal estate. The third item recites — “Whereas the farm on which I now reside, consisting of fifty acres, * * * was originally purchased, conveyed to and owned by me; and whereas the ten acres immediately adjoining said fifty acres on the south, and being part of what is known as the Greenlee farm, was owned by my deceased husband, John Greenlee; and whereas, many years ago during the lifetime of my said husband, I myself being sick in extremis, my said husband having some collateral heirs hereinafter named, and desiring to make some disposition of our said real estate, in view of my impending or contemplated death, my said husband then procured to be drafted and formally executed, two several deeds whereby my said fifty acres of land were formally *305 conveyed through a trustee to my said husband, John Greenlee, but which deeds have never been recorded and are yet in my possession; and whereas, at the same time and contemporaneously with the formal execution of said deeds, the said John Greenlee executed after some form and fashion his last will and testament whereby he directed, devised and bequeathed all his property to me for life, and provided in substance that upon my decease, said entire Greenlee farrri of sixty acres should be sold and the proceeds divided into five-equal moieties— one to the said Mary Duffield; one to Matthew Willis; one to John Willis; one to Rachel Duffield, and one to Jane Beeson. * * * And whereas, notwithstanding the death of John Greenlee many years ago, the said will was never probated, nor offered for probate, but the same has remained along with the said two deeds in my possession, and I am advised and believe there is grave doubt as to the validity of either said deeds or said will upon the legal title to said land. Now, therefore, in order so far as possible to carry into effect my husband’s plan of testamentary disposition, I will and direct that soon as practical after my decease my executors hereinafter named shall sell all of said real estate, including said ten acres so formerly owned by my said husband, and which but for said will I do inherit, either at public or private sale in their discretion. That after deducting from the pro-> ceeds of such sale the reasonable cost and expense of. the settlement of my estate and of said sale, that the balance of said proceeds be divided into five equal moieties and disbursed and paid out as *306 follows: One moiety to Mary Duffield; one moiety to Matthew Willis; one moiety to John Willis; one moiety to Rachel Duffield; one moiety to Jane Beeson.” This is followed by a provision concerning the rights of any beneficiary who should contest her will.
The testatrix seemed to have a distinct and accurate memory of the transaction of December 23d, 1900- — more than ten years previous — and while she recites in her will that when she signed the deed she was “sick in extremis,” it is not pointed out or asserted that she was unconscious' or otherwise mentally incompetent. She recalls the purpose which the husband had in view in the execution of the deeds and will, and, loyal to his memory, she would follow and execute his purpose by devising the land or its proceeds to the same beneficiaries — the nephews and nieces. It is not now disputed that when she made this will she was of sound mind and disposing memory, and a more emphatic ratification of what was attempted to be accomplished by the deeds and will, we can not imagine. The doubt about their validity was not her doubt, but a doubt which her adviser had inspired, and she made her will in order to set everything at rest. But she can not thus cut out the deeds and will of December 23, 1900. They had been delivered and were never revoked or legally set aside. They were not “held as relics of a time ■ gone by,” as averred in the petition, nor “kept as relics and mementoes,” as stated by the circuit court. They were living instruments solemnly executed according to legal formalities, and should be placed on record as such.
*307 The circuit court did not follow the correct rule as to the standard of proof required to sustain the plaintiffs’ case, and its judgment is reversed; and as all the evidence is before this court, it seems unnecessary to remand the case for another trial, and we think it our duty to render final judgment.
The plaintiff is denied the relief prayed for, and his petition is dismissed. The plaintiff is directed to surrender to the plaintiffs in error the deeds in controversy that they may be recorded.

Judgment reversed.

Shauck, C. J., Crew, Summers, Spear and Davis, JJ., concur.